*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

DBD KAZOO LLC,

        Plaintiff-Appellant,

v

WESTERN MICHIGAN LLC, FV NORTH LLC, 1324EN LLC, ENCORE2 PROPERTY INVESTMENT LLC, ENCORE PROPERTY INVESTMENT LLC, MARIAN KENNEDY, UNIVERSITY ACQUISITIONS LLC, UNIVERSITY OPERATIONS LLC, GROSS & COHEN REAL ESTATE INVESTORS LTD, MICHAEL S. COHEN, ASSET CAMPUS HOUSING INC, ASSET CAMPUS USA LLC,

        Defendants-Appellees,

and

STEVEN J. GROSS,

Defendant.

FOR PUBLICATION
February 8, 2024
9:05 a.m.

No. 361299
Kalamazoo Circuit Court
LC No. 2017-000259-CB

Before: REDFORD, P.J., and SHAPIRO and YATES, JJ.

REDFORD, P.J.

Plaintiff, DBD Kazoo LLC, appeals by right the trial court's final order denying plaintiffs' motion for reconsideration, grant of summary disposition to defendants, and dismissal of all claims against defendants. We affirm.

## I. FACTUAL BACKGROUND

Plaintiff, is the assignee of a $19,060,000 mortgage loan made by Fortress Credit Company LLC (Fortress) to finance SQ Kalamazoo Owners, LLC's (SQK) purchase of a student housing

-1-

community (the Property[1]) located in Kalamazoo, Michigan at 1324 Lafayette Avenue, approximately two blocks from Western Michigan University. Student Quarters, LLC[2] (SQ) negotiated the real estate transaction and later assigned its rights to SQK. Defendants Western Michigan, LLC, FV North, LLC, and 1324EN, LLC (the Sellers) owned and sold the Property to SQK. Defendants Encore Property Investment, LLC (Encore), University Operations, LLC (UO), and Gross & Cohen Real Estate Investors, Ltd (Gross & Cohen) were co-managers of the Sellers or otherwise affiliated entities of the co-managers. Defendant Marian Kennedy served Encore as its representative. Defendant Michael Cohen served as UO's representative. Defendant Asset Campus Housing, Inc. (ACH) managed the Property for Western Michigan, LLC, FV North, LLC, 1324EN, LLC, FV South LLC, and FV 12 LLC under a property management agreement. Asset Campus USA, LLC (AC-USA) entered a property management agreement with SQK on April 1, 2015, to serve as the new owner's manager of the Property after consummation of the purchase transaction.

The ACH management agreement required the parties to cooperate "in all matters relating to the management, leasing, operation, and eventual sale of" the Property, and ACH had the obligation to "promptly respond to all reasonable requests for information by Owner in connection with the management, leasing operation or sale of" the Property. The management agreement required ACH to work with an accountant designated by the owners of the Property and prepare among other things monthly and annual reports, and keep a comprehensive system of office records, books, and accounts pertaining to the immediately preceding 12 months of operations of the Property for the owners. It also expressly limited ACH's authority to act for or on behalf of the owners, or to bind the owners or their assets in connection with the Property. All of ACH's actions were subject to the constraints of the operating budget and receipt of the owners' approval or lack of objection.

On July 18, 2014, the Sellers executed a purchase agreement to sell the Property to SQ for $19,000,000. The parties agreed to a 30-day due diligence period and the Sellers agreed to make the Property available for inspection and to work with ACH, the Property's manager, to provide certain specified materials to SQ. The agreement set the closing to occur 30 days after the expiration of the due diligence period, but granted SQ the option to extend the closing date for an additional 15 days so that SQ could complete its financing for the purchase. The agreement also provided that it "contains the entire agreement of the parties hereto, and no representations, inducements, promises, or agreements, oral or otherwise, between the parties not embodied herein shall be of any force or effect." On August 14, 2014, United Consulting presented Andy Feinour, SQ's president and a representative of St. Clair Holdings, an affiliate of SQ, a property condition survey which reported regarding the physical condition of the Property including observations about the units inspected and the roofs of the buildings.

On September 2, 2014, the Sellers and SQ executed an amended purchase agreement in which the parties acknowledged that the due diligence period expired on that date but SQ's equity

---

[1] The Property is commonly known as Thirteen24 Apartments consisting of 21 two- and three-story apartment buildings.

[2] SQ Kalamazoo Owner, LLC is the successor of SQ and is not a party to this action.

partner continued to review the Property and the transaction contemplated by the agreement, and gave SQ the right to terminate it until September 17, 2014. On September 10, 2014, SQ gave Kennedy and Cohen notice that it elected to terminate the amended purchase agreement because its investor decided not to participate as an equity partner.

On December 22, 2014, the Sellers and SQ executed a reinstatement and second amended purchase agreement. That agreement recited that the original agreement had terminated according to its terms and that the parties desired to reinstate the agreement with certain amended provisions. The agreement stated that SQ requested an April 2015 closing date and a price adjustment to address operational performance issues described as potential lower occupancy or net collection respecting the Property. The new agreement also reduced the sale price to $18,800,000 and set the closing for April 16, 2015. The agreement provided further that the due diligence period had expired and that SQ agreed "that neither the results of any further inspections by Purchaser or any party related to the Purchaser nor the operational performance of the Property shall be either a condition precedent to Closing or a basis to adjust the Purchase Price in any way."

On or around February 11, 2015, a company named CBRE presented Ivan Yee, Fortress's senior vice president, a property condition assessment that rated the general condition of the Property as fair to good. CBRE rated the roofs of the buildings fair to good but specified that certain buildings had 30-year-old roofs that required replacement. CBRE communicated with a roofing contractor who disclosed that the Property had a roof that required maintenance because of trapped moisture. The property condition assessment disclosed issues with the roofs of buildings and that they required replacement. CBRE rated the unit interiors fair to good and noted several issues requiring maintenance. CBRE's property condition assessment indicated microbial growth staining and featured photographs that depicted staining and peeling paint in units and common areas. CBRE reported no significant indications of mold or water infiltration and that ACH employees did not report concerns about such.

During March 2015, CBRE also presented Yee a certified professional appraisal of the Property's operations and value as of February 2015. CBRE concluded that the Property had an "as is" market value of $19,700,000 and projected an estimated future value of $25,690,000. CBRE noted as a weakness that the Property had a decline in occupancy in the 2013 school year, but strengths included improving occupancy and good overall property condition. The appraisal noted that Western Michigan University had a declining enrollment trend over the last decade and stated that the Property had 93% occupancy and compared that with comparable local apartment rental properties. The appraisal factored in an allowance for nonpayment of rent or other income and noted that historical losses had been increasing. The appraisal projected a rosy financial future for the Property.

Under the terms of their agreements, the Sellers provided SQ the information it requested regarding the physical and financial condition of the Property, and SQ provided Fortress the information and documentation that Fortress requested. SQ sent to Fortress the United Consulting property condition report. It is not disputed that the Sellers had no direct contact or communications with Fortress.

Around March 16, 2015, Fortress's small balance loan team issued a memorandum (the Credit Memo) describing a loan opportunity to fund the sale of the Property to SQ and summarized

the loan and rationale for making such loan. It projected a very positive increase in the net operating income and a substantial accrual in value in four years and noted that the negotiated purchase price was $900,000 lower than the "as is" appraised value. The Credit Memo recognized that the lender faced an inherent risk related to the borrower's ability to achieve the rental rate as projected by the underwriting team. It concluded, however, that the loan would be a positive part of Fortress's portfolio. Yee testified that he approved the loan on or around March 16, 2015.

Around March 23, 2015, Yee conducted a site visit of the Property during which he went through some rental units and afterward he spoke with some on-site ACH employees.

Around April 3, 2015, SQ's attorney sent Fortress's attorney the Property's April 2015 financial information which included among other records a certified updated rent roll, a detailed delinquency report, and a trailing 12-month income statement. The April 2015 rent roll showed the amount owed by each tenant as of April 2, 2015. Fortress's lender closing binder contained the April 2015 financial documents.

On April 7, 2015, the Sellers and SQK entered an agreement respecting the sale of the Property. The document identified SQK as the purchaser and stated that SQ assigned to SQK on March 31, 2015, its rights as the purchaser under SQ's agreements with the Sellers. This agreement specified that a " 'book' delinquency in the amount of $127,112.42 exists as of April 2, 2015, representing the difference between the total rent due and the total rent collected as of April 2, 2015 by [ACH] . . . ." The parties agreed that most of the delinquent rent would be credited against the purchase price and later paid by the purchaser to the Sellers when such rent was received after closing. The agreement specified that it contained "the entire agreement of the parties and no representations, inducements, promises, or agreements, oral or otherwise, between the parties not embodied herein shall be of any force or effect." The agreement also stated that it represented the final agreement between the parties and could not be contradicted by evidence of prior, contemporaneous, or subsequent oral agreements of the parties" and that there were no other written or oral agreements between them. The purchase transaction and loan closed on April 7, 2015. The loan agreement between SQK and Fortress recited that concurrent with the loan SQK acquired the Property and borrowed to finance the acquisition, and for capital improvements to the Property. The loan agreement provided for an initial advance of $17,160,000 at closing to acquire the Property and pay fees to the lender, and a future advance of $1,900,000 when the borrower completed certain improvements. The loan agreement required the borrower to execute a promissory note and grant Fortress a mortgage on the Property as security. The loan agreement did not condition the loan on the percentage of occupancy or define the term "tenant" to include only students, nor did it require that only students could be tenants. The loan agreement did not require SQK to warrant that the Property was free from defects.

Within a year of the transaction's closing, SQK defaulted and Fortress, or an assignee, foreclosed on the mortgage. Through a series of assignments plaintiff obtained Fortress's rights to the claims asserted in this lawsuit and it sued defendants. Plaintiff alleged that defendants provided false information and representations to SQ regarding its physical and financial condition to induce it to purchase the Property, and that Fortress relied on false representations to approve and make the loan. Plaintiff alleged counts for fraud and negligent misrepresentation against all defendants, a count seeking piercing of the corporate veil against Encore, Encore 2 Property Investment, LLC (Encore2), UO, University Acquisitions, LLC (UA), Gross & Cohen, Kennedy,

and Cohen, and a count for civil conspiracy against all defendants. Plaintiff alleged that defendants misrepresented the physical condition of the Property, and its tenant delinquencies and financial condition, withheld such information, and, but for such conduct, Fortress would not have made the loan.

The parties conducted discovery and afterward the Sellers, Encore, Encore2, UA, UO, Gross & Cohen, Kennedy, and Cohen moved for summary disposition. ACH and AC-USA joined in the motion. Defendants asserted that the undisputed facts established that plaintiff had in its possession or available to it all the information that plaintiff claimed it did not know in advance of closing the loan, and argued that plaintiff's fraud and negligent misrepresentation claims failed as a matter of law because plaintiff could not prove reasonable reliance, an essential element of its claims. Plaintiff opposed the motion. In a detailed written opinion and order, the trial court ruled in favor of defendants. The court concluded that plaintiff failed and could not establish that Fortress reasonably relied on alleged misrepresentations by defendants, and in particular, such allegedly made by ACH employees, who were not authorized to serve as agents of the Sellers respecting the sale transaction.

Plaintiff moved for clarification of the court's order and for reconsideration. The trial court denied the motion for reconsideration, clarified its previous ruling, and entered a final order dismissing plaintiff's case. Plaintiff now appeals.

## II. STANDARD OF REVIEW

This Court reviews de novo a trial court's decision on a motion for summary disposition. *Maiden v Rozwood*, 461 Mich 109, 118; 597 NW2d 817 (1999). "A motion under MCR 2.116(C)(10) tests the factual sufficiency of the complaint." *Id*. at 120. A court considers the "affidavits, pleadings, depositions, admissions, and other evidence submitted by the parties . . . in the light most favorable to the party opposing the motion." *Id*. "When a motion under subrule (C)(10) is made and supported . . . an adverse party may not rest upon the mere allegations or denials of his or her pleading, but must, by affidavits or as otherwise provided in this rule, set forth specific facts showing that there is a genuine issue for trial." MCR 2.116(G)(4). "Where the proffered evidence fails to establish a genuine issue regarding any material fact, the moving party is entitled to judgment as a matter of law." *Maiden*, 461 Mic. at 120. The party who moves for summary disposition under MCR 2.116 bears the initial burden of production, which may be satisfied in one of two ways. *Quinto v Cross & Peters Co*, 451 Mich 358, 361; 547 NW2d 314 (1996). The moving party may either submit affirmative evidence that negates an essential element of the nonmoving party's claim or demonstrate to the trial court that the nonmoving party's evidence fails to establish an essential element of the nonmoving party's claim. *Id*. at 362. Once the moving party satisfies its burden in one of those two ways, "[t]he burden then shifts to the opposing party to establish that a genuine issue of disputed fact exists." *Id*. The reviewing court "should evaluate a motion for summary disposition under MCR 2.116(C)(10) by considering the substantively admissible evidence actually proffered." *Maiden*, 461 Mich at 121.

## III. ANALYSIS

Plaintiff argues that the trial court erred because a genuine issue of material fact exists whether ACH served as an agent of the Sellers with actual or apparent authority to make

representations regarding the physical and financial condition of the Property and Fortress reasonably relied on such to make the loan.  We disagree.

"Under fundamental agency law, a principal is bound by an agent's actions within the agent's actual or apparent authority." *James v Alberts*, 464 Mich 12, 15; 626 NW2d 158 (2001). "The authority of an agent to bind a principal may be either actual or apparent." *Alar v Mercy Mem Hosp*, 208 Mich App 518, 528; 529 NW2d 318 (1995).  "Actual authority may be express or implied.  Implied authority is the authority which an agent believes he possesses." *Meretta v Peach*, 195 Mich App 695, 698; 491 NW2d 278 (1992).  "Implied authority consists of the power to do all things which are reasonably necessary or proper to efficiently carry into effect the power conferred, unless it be a thing specifically forbidden." *Wigfall v Detroit*, 504 Mich 330, 340; 934 NW2d 760 (2019) (quotation marks and citations omitted).  "Whether the act in question is within the authority granted depends upon the act's usual or necessary connection to accomplishing the purpose of the agency." *Id*. at 341. (quotation marks and citations omitted).  "Implied authority is not without limits: The apparent or implied authority of an agent cannot be so extended as to permit him to depart from the usual manner of accomplishing what he is employed to effect.  Nor can he enlarge his powers by unauthorized representations and promises." *Id*. (quotation marks and citations omitted).  "An implied agency cannot exist contrary to the express intention of an alleged principal although it may spring from acts and circumstances permitted by the principal over a course of time through acquiescence." *Id*. at 341-342 (quotation marks and citation omitted).

"Actual authority of an agent may be implied from the circumstances surrounding the transaction at issue." *Hertz Corp v Volvo Truck Corp*, 210 Mich App 243, 246; 533 NW2d 15 (1995).  "These circumstances must show that the principal actually intended the agent to possess the authority to enter into the transaction on behalf of the principal." *Id*. "Apparent authority arises where the acts and appearances lead a third person reasonably to believe that an agency relationship exists.  However, apparent authority must be traceable to the principal and cannot be established only by the acts and conduct of the agent." *Alar*, 208 Mich App at 528.  Whether an agent possessed apparent authority to perform a specific act requires the court to review all surrounding facts and circumstances and determine whether an ordinarily prudent person in the relevant business would be justified in assuming that the agent had authority to act on behalf of the principal as alleged. *Meretta*, 195 Mich App at 699.

In this case, the parties do not dispute the fact that ACH served as the agent of WM, 1324EN, FV North, FV South, and FV 12, pursuant to the property management agreement. Plaintiff contends that, under that agreement, the Sellers granted ACH broad authority to represent the Sellers in the Property sale transaction and that ACH was authorized to make representations on behalf of the Sellers to Fortress on which Fortress could rely to make the loan to SQK. Analysis of that management agreement, however, does not support plaintiff's contentions.  Under the management agreement, the owners granted ACH authority to manage the property.  The management agreement required ACH to consult with the owners as required and necessary to perform its duties.  The management agreement required ACH to cooperate with the owners regarding management, leasing, operation, and the eventual sale of the Property.  The agreement limited ACH's authority and responsibilities to management and operation of the Property.  The agreement gave ACH the power to do all things reasonably necessary or proper to efficiently carry into effect the power conferred, but it did not authorize ACH to speak on behalf of the owners, nor did its terms designate ACH as a representative with authority to speak for the Sellers or act as the

Sellers' agent in relation to the sale transaction. The management agreement neither expressly nor impliedly authorized ACH to serve as the Sellers' agent with authority to bind the Sellers by representations regarding the physical or financial condition of the Property, or to communicate with any lender of a buyer of the Property. Nothing in the management agreement remotely suggests that ACH had actual, express or implied, or apparent authority to do so.

Further, no evidence in the record indicates that the Sellers separately gave ACH express or implied authority to engage in the sale transaction other than to cooperate with the Sellers to assist them in providing SQ information that SQ requested. The Sellers did nothing to cloak ACH with actual or apparent authority to bind the Sellers by making representations to the buyer or its lender, Fortress. The surrounding facts and circumstance also do not establish that the Sellers actually intended ACH to possess the authority to communicate on the Sellers' behalf with any lender for the buyer of the Property.

Further, the evidence establishes that the Sellers had no direct contact with Fortress, and for the sale transaction, the Sellers communicated exclusively with SQ and provided SQ the information that SQ requested. That information consisted of financial documentation prepared in the ordinary course of the Property's business operation. The terms of the sale transaction with SQ, as set forth in the initial purchase agreement, first amended purchase agreement, and reinstatement and second amendment to the purchase agreement, did not make warranties or representations as to the Property's physical or financial condition, and no evidence establishes that the parties changed those terms. The initial agreement provided that it "contains the entire agreement of the parties hereto, and no representations, inducements, promises, or agreements, oral or otherwise, between the parties not embodied herein shall be of any force or effect." Under the reinstatement and second amendment to the purchase agreement, SQ agreed that neither any further inspections by it or any party related to it, nor the operational performance of the Property, would be a condition precedent to closing or a basis for adjusting the purchase price.

The record indicates that Fortress conducted its own due diligence without contact with the Sellers. Fortress did not request permission to speak with ACH personnel, nor did it request that the Sellers authorize ACH personnel to speak with Fortress regarding the physical or financial condition of the Property. No evidence establishes that ACH had apparent authority granted by the Sellers to act in that regard. The evidence does not imply that ACH had such power to act to bind the Sellers with representations regarding any aspect of the Property in relation to the sale transaction or the corresponding loan transaction. Further, no evidence indicates that the low level, on-site ACH employees had authority to speak on behalf of ACH, let alone on behalf of the Sellers. The evidence in this case establishes that an ordinarily prudent person in the commercial lending business would not be justified under the circumstances of this case to assume that ACH's on-site employees had authority to act on behalf of the Sellers. Plaintiff presented no evidence to the trial court to establish that the scope of agency authority granted by the Sellers to ACH encompassed making representations to Fortress regarding the physical or financial condition the Property. Plaintiff's agency theory attributing misrepresentations to the Sellers because of alleged statements by ACH low level on-site employees, fails as a matter of law.

The record reflects that the trial court considered and analyzed all of the surrounding facts and circumstances and determined that the evidence did not establish that ACH had actual or apparent authority traceable to the Sellers, to serve as the Sellers' agent with authority to make

representations to Fortress regarding the physical or financial condition the Property. The court correctly observed that the management agreement between the Sellers and ACH specified the extent of ACH's agency authority. The court further analyzed the surrounding facts and circumstances and properly determined that nothing in the record supported finding that ACH had actual or apparent authority granted by the Sellers to make representations to Fortress regarding the status of the Property. Further, the court correctly concluded that ACH's low level, on-site employees did not have agency authority to bind the Sellers as alleged by plaintiff, and the record evidence did not support plaintiff's contentions regarding the scope of ACH's agency. Accordingly, plaintiff could not reasonably rely on purported statements made by ACH's employees who lacked agency authority to bind the Sellers. The trial court, therefore, did not err in this regard.

Plaintiff also argues that the trial court erred by granting summary disposition to defendants because a genuine issue of fact existed whether plaintiff reasonably relied on misrepresentations defendants made regarding the physical and financial condition of the Property to approve and make the loan to SQK. We disagree.

In its first amended complaint, plaintiff alleged that defendants committed fraud and negligent misrepresentation in relation to the loan transaction that Fortress made with SQK. In *Titan Ins Co v Hyten*, 491 Mich 547, 555; 817 NW2d 562 (2012), our Supreme Court stated the elements of fraud as follows:

> (1) That defendant made a material representation; (2) that it was false; (3) that when he made it he knew that it was false, or made it recklessly, without any knowledge of its truth and as a positive assertion; (4) that he made it with the intention that it should be acted upon by plaintiff; (5) that plaintiff acted in reliance upon it; and (6) that he thereby suffered injury. Each of these facts must be proved with a reasonable degree of certainty, and all of them must be found to exist; the absence of any one of them is fatal to a recovery. [Citations omitted.]

A claim of negligent misrepresentation requires that the "defendant owe a duty to the plaintiff." *Alfieri v Bertorelli*, 295 Mich App 189, 194; 813 NW2d 772 (2012). "[A] duty of disclosure may be imposed on a seller's agent to disclose newly acquired information that is recognized by the agent as rendering a prior affirmative statement untrue or misleading." *Id*. (citing *United States Fidelity & Guaranty Co v Black*, 412 Mich 99, 126-128 313 NW2d 77 (1981)).

The *Titan* Court stated:

> Concerning the reliance prong, it is true that "fraud is not perpetrated upon one who has full knowledge to the contrary of a representation." *Montgomery Ward & Co v Williams,* 330 Mich 275, 284; 47 NW2d 607 (1951). But there is no common-law duty to attempt to acquire such knowledge. For it is "well settled law that a payment . . . may be recovered, even if the mistake be due to lack of investigation." *Id.,* quoting *Couper v Metro Life Ins Co,* 250 Mich 540, 544; 230 NW 929 (1930).

> The Court of Appeals in the instant case held that "[t]here can be no fraud where a person has the *means* to determine that a representation is not true." *Hyten I,* 291 Mich App at

462; 805 NW2d 503, quoting *Nieves v Bell Industries, Inc,* 204 Mich App 459, 464; 517 NW2d 235 (1994) (emphasis added). When read in isolation, this statement might support the panel's conclusion that an insurer has a duty to investigate representations made by a potential insured. However, when the statement is read in the full context of the *Nieves* opinion, as well as other precedent, it is clear that an insurer has no duty to investigate the representations of a potential insured. The Court of Appeals in the instant case failed to recognize that in *Nieves,* and in the two cases relied on by *Nieves* in the pertinent portion of its opinion, *Montgomery Ward,* 330 Mich 275; 47 NW2d 607, and *Webb v First of Mich Corp,* 195 Mich App 470; 491 NW2d 851 (1992), the allegedly defrauded party was given direct information refuting the misrepresentations. **Ignoring information that contradicts a misrepresentation is considerably different than failing to affirmatively and actively investigate a representation.**

In *Mable Cleary Trust v Edward-Marlah Muzyl Trust,* 262 Mich App 485, 501; 686 NW2d 770 (2004), the Court of Appeals held that the rule articulated in *Nieves* is only applied when the plaintiff was "either presented with the information and chose to ignore it *or had some other indication that further inquiry was needed.*" (Emphasis added.) To the extent that the latter part of this statement can be read to support the proposition that a party has an independent duty to investigate and corroborate representations, we overrule *Mable Cleary Trust*. *Titan* 491 Mich at 555 n4 (emphasis added)

The Court also wrote: "This is not to say, of course, that one may wilfully close his eyes to that which others clearly see." *Id.* at 562.

The *Titan* Court explained that proof of fraud does not require a plaintiff to prove that "the fraud could not have been discovered through the exercise of reasonable diligence." *Titan*, 491 Mich at 557. "Stated differently, [fraud does] not require the party asserting fraud to have performed an investigation of all assertions and representations made by its contracting partner as a prerequisite to establishing fraud." *Id*. Both fraud and misrepresentation claims, however, require proof of reasonable reliance on a false representation. *Nieves v Bell Indus, Inc*, 204 Mich App 459, 464; 517 NW2d 235 (1994). "There can be no fraud where a person has the means to determine that a representation is not true." *Id*. "[A] plaintiff cannot claim to have been defrauded where he had information available to him that he chose to ignore." *Id*. at 465. Recently, in *Coosard v Tarrant*, 342 Mich App 620, 637; ___ NW2d ___ (2022) (quotation marks, alteration, and citation omitted), this Court reiterated the general rule that "there is no fraud where means of knowledge are open to the plaintiff and the degree of their utilization is circumscribed in no respect by defendant." It explained that the "general rule has an important caveat: parties do not have an independent duty to investigate and corroborate representations <u>unless</u> they were presented with some information or affirmative indication that further investigation was necessary." *Id*. at 637-638 (emphasis added, quotation marks and citations omitted).

Although *Titan* makes clear that a party asserting fraud does not have an affirmative duty to exercise due diligence to determine the veracity of any representations, *Titan* does not undermine the requirement that a party's reliance on a misrepresentation must still be reasonable, and it does not preclude a finding that a party's reliance will not be reasonable if the party is armed with actual knowledge of facts making any reliance on alleged misrepresentations unreasonable.

A plaintiff who was given evidence that information was unreliable cannot, nonetheless, reasonably rely upon it. *Fejedelem v Kasco*, 269 Mich App 499, 503-504; 711 NW2d 436 (2006).

Plaintiff asserts that the rule expressed in *Titan* governs this case and dictates that it could rely on alleged misrepresentations and disregard the information it possessed that contradicted such. Under *Titan*, it is true that a plaintiff does not have a duty to investigate the veracity of representations by conducting due diligence to discover falsity. *Titan*, however, does not preclude a trial court from finding a plaintiff's reliance unreasonable if the plaintiff had actual knowledge and information that establishes its claimed reliance unreasonable. *Titan* does not undermine the longstanding doctrine that a plaintiff cannot claim to have been defrauded where he had information available to him that he chose to ignore.

In this case, the record reflects that the Sellers provided the information requested by SQ. ACH assisted the Sellers in doing so by providing the requested financial information which evidence established consisted of the routine financial documentation that ACH provided the Sellers in the ordinary course of business as required under the management agreement. The information provided consisted of the same reports the Sellers relied on in the regular operation of the Property. Plaintiff argued to the trial court that the Sellers misrepresented the physical condition of the Property because ACH employees did not disclose negative aspects of the condition. Plaintiff also argued that the Sellers misrepresented the financial condition of the Property by not disclosing tenant delinquencies and bad debt. The record reflects that Fortress had information regarding the physical condition of the Property and its financial condition but chose to ignore it.

No evidence supports the conclusion that ACH or the Sellers "cooked" the books to hide information regarding the financial condition of the Property. Fortress requested and obtained from SQ the information that Fortress required in its underwriting process to determine whether to approve and consummate the loan transaction. The Sellers had no direct communication with Fortress. The Sellers also made the Property available to SQ and Fortress for inspection by professional inspection and appraisal companies. SQ provided Fortress the United Consulting property condition report which SQ commissioned that identified physical conditions of the Property including microbial growth and mold on the premises and issues with the roofs. Fortress chose to ignore that report. CBRE similarly provided plaintiff its assessment of the condition of the roofs and disclosed moisture problems as well as microbial issues on the premises. CBRE rated the roofs of the buildings fair to good but specified that certain buildings had 30-year-old roofs that required replacement. Respecting the operation and financial condition of the Property, CBRE provided Fortress an appraisal that stated that the Property had a decline in occupancy in the 2013 school year and factored into its valuation an allowance for nonpayment of rent or other income and historical losses that had been increasing.

Yee personally visited the Property but apparently chose not to inspect the roofs or examine the readily available maintenance records that revealed the issues indicated by the United Consulting report and the CBRE property condition assessment. Yee asserted that ACH low level, on-site employees made representations regarding the physical and financial condition on which he relied to approve the loan, but those employees were not authorized by the Sellers to make binding representations on behalf of the Sellers. Further, before Yee visited the Property, he and Fortress had the physical condition reports which provided detailed information that contradicted

the purported favorable representations later made by the ACH on-site employees during Yee's visit.

The purchase agreements also made clear that the Sellers made no warranties respecting the physical condition of the Property. The purchase agreement contained the entire agreement of the parties "and no representations, inducements, promises, or agreements, oral or otherwise, between the parties not embodied herein shall be of any force or effect" and the December 21, 2014 reinstatement and second amended purchase agreement reinstated that merger provision and provided that no further inspections nor the operational performance of the Property could be conditions precedent to closing. Although that contract existed between the Sellers and the buyer and did not bind Fortress, its terms were known to Fortress. The reinstatement and second amendment to the purchase agreement expressly made a significant price adjustment to address operational performance issues such as potential lower occupancy or net collection respecting the Property. Fortress had the agreements in its possession and therefore knew or should have known that no representations or warranties of the physical or financial condition of the Property formed the basis of the purchase transaction for its borrower. More importantly, Fortress did not make such conditions prerequisites to underwriting, approval, or closing of the loan with its borrower. The loan agreement did not require SQK to warrant that the Property was free from physical defects.

The Credit Memo that Yee and his underwriting team issued stated that the lender faced an inherent risk related to the borrower's ability to achieve the rental rate as projected. No evidence establishes that, as a condition of underwriting, approving, or making the loan, Fortress required the Property to have a specific percentage of occupancy, a limitation on tenant delinquencies, a limitation of bad debt, specific eviction standards or criteria, or tenant application criteria. Further, Fortress never requested rental criteria, eviction records, never conducted a lease audit, nor requested any delinquency reports. The Fortress loan agreement did not condition the loan on the percentage of occupancy or define the term "tenant" to include only students or require that only students could be tenants. Nor did it require that the Property have any limited number of tenant delinquencies.

Respecting the occupancy rate and delinquencies, and the financial condition of the Property, the record indicates that the Sellers provided to SQ financial documentation including the trailing 12-month income report, aging accounts receivable, and February and March rent rolls, among other information. Before closing, the Sellers provided the buyer's counsel, who forwarded to Fortress's counsel, the April 2015 financial records which included the April rent roll certified by the buyer, and a complete and detailed delinquency report that disclosed information regarding every tenant's account and showed all past due rent and other charges. Plaintiff's loan closing binder contained copies of these updated financial documents. The Sellers cannot be said to have misrepresented any financial information or hidden from Fortress any information regarding occupancy or tenant delinquencies, accounts receivable, and bad debt, as plaintiff alleged, because Fortress had true financial information before closing. Fortress, however, chose to ignore it. Even if ACH on-site employees made representations to Yee regarding delinquencies or other financial aspects of operation of the Property, Fortress actually had accurate information in its possession before it closed the loan. That information contradicted the alleged misrepresentations.

This Court has repeatedly explained that "there can be no fraud where the means of knowledge regarding the truthfulness of the representation are available to the plaintiff and the degree of their utilization has not been prohibited by the defendant." *Bev Smith, Inc v Atwell*, 301 Mich App 670, 688; 836 NW2d 872 (2013) (quoting *Webb v First of Mich Corp*, 195 Mich App 470, 474; 491 NW2d 851 (1992)). In *Atwell*, this Court explained that, where the plaintiff had documents that disclosed in detail the things about which the plaintiff complained, and had a full and fair opportunity to inspect the vehicle before buying it, but did not do so, "the plaintiff fully possessed the means of discovering the truth or falsity of defendant's representations, and plaintiff's ability to utilize these means was never prohibited or impeded by defendant in any way" but chose to ignore it. *Id*. at 689 (citations omitted). This Court held that the plaintiff's fraud claim failed as a matter of law and the trial court properly granted the defendant summary disposition. That is precisely what happened in the case at bar. Fortress possessed true information that gave it the means of discovering the truth of the alleged misrepresentations. It had accurate information and a full and fair opportunity to inspect the physical and financial condition of the Property. From the inspection reports of the Property and the financial documents provided by the Sellers to SQ, which in turn provided it to Fortress, Fortress possessed the information and had the unimpeded ability to know the truth but chose to ignore it. Fortress, as a matter of law, could not and did not reasonably rely on any alleged misrepresentations by defendants. Plaintiff, as assignee of Fortress, therefore, cannot prevail on its fraud claims.

The record reflects that the trial court appropriately analyzed the surrounding facts and circumstances in a light most favorable to plaintiff and correctly determined that plaintiff could not establish the reasonable reliance element of its fraud claims. The trial court correctly discerned that its conspiracy claim rested on its ability to prove the fraud-based claims, and correctly ruled that that claim failed as well. Accordingly, the trial court properly granted defendants summary disposition and dismissed plaintiff's case.

Affirmed.

/s/ James Robert Redford
/s/ Douglas B. Shapiro
/s/ Christopher P. Yates